IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 06-cv-02362-JLK

MARGEE JOHNSON,

      Plaintiff,

v.

WELD COUNTY, COLORADO, a governmental entity,

      Defendant.

_____

MEMORANDUM OPINION AND ORDER
_____

Kane, J.

      Defendant Weld County moves for summary judgment on plaintiff Margie

Johnson's "employment discrimination" claims under Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000e, *et seq.*, the Americans with Disabilities Act of 1990, 42 U.S.C.

§§ 12101-12213, and C.R.S. § 24-34-401 (Doc. 11).[1]  After considering carefully the

---

[1]  Johnson asserted these claims in one-sentence conclusory fashion in her Complaint and
continued to characterize them in vague and obfuscating terms until Defendant forced delineation in its
Motion for Summary Judgment, *see* Compl. (Doc. 1), ¶¶ 23-25 *and* Scheduling Order (Doc. 5) at 2
(Statement of Claims and Defenses).  Viewing Johnson's allegations and ongoing characterizations in the
light most favorable to her, it is clear her theories of relief are premised on claims that she was passed
over for promotion, retaliated against and then constructively discharged on the basis of both gender and
disability.  While Johnson's allegations initially suggested an additional claim for "unequal pay" under
Title VII, *See* Scheduling Order at 2, her allegations are insufficient to support a formal claim for sex-
based pay discrimination and she appears to have abandoned it during the course of summary judgment
briefing.  *See, e.g., Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1363 (10th Cir. 1997)(to establish a
prima facie case of sex-based pay discrimination under Title VII, plaintiff must come forward with facts
tending to demonstrate that she occupies a job similar to that of higher paid males); *see also Cone v.
Longmont United Hosp. Ass'n*, 14 F.3d 526, 632 (10th Cir. 1994).  Moreover, in the wake of the Supreme
Court's decision in *Ledbetter v. Goodyear Tire & Rubber Co.*, __ U.S. __, 127 S. Ct. 2162 (2007), it is
dubious such a claim would be cognizable in this case in any event.  Based on Johnson's failure to assert
the claim in any formal manner in her summary judgment brief or otherwise, I find the claim has been

briefs of the parties and applicable legal authorities, I GRANT the Motion.

## I.  LEGAL STANDARD.

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  *Adamson v. Multicommunity Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir.2008)*; see* Fed. R. Civ. P. 56(c).  A fact is material if, under the governing law, it could affect the outcome of the suit.  *Id.*  A dispute is genuine if a rational jury could find for the nonmoving party on the issue.  *See id.*   In applying the standard, the court considers the factual record in the light most favorable to the nonmoving party without weighing the evidence.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A mere scintilla of evidence in support of the nonmovant's position is insufficient to create a genuine dispute of fact.  *Lawmaster v. Ward,* 125 F.3d 1341, 1347 (10th Cir.1997).  Nor do unsupported conclusory allegations create a genuine dispute of fact.  *See Mackenzie v. City and County of Denver*, 414 F.3d 1266, 1273 (10th Cir.2005).[2]  In particular, when the nonmoving party will bear the burden of proof at trial, that party must designate specific facts in order to establish the existence of a material issue of fact and survive summary judgment. *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir.1998) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

---

abandoned and address it no further in this opinion.

[2]     This standard on summary judgment is consistent with the Supreme Court's holding in *Bell Atlantic Corp v. Twombly* that, to withstand a motion to dismiss, a complaint must allege actual facts supporting a claim to relief that is plausible on its face.  *See* --- U.S. ----, ----, 127 S.Ct. 1955, 1974 (2007); *applied in Atwell v. Gabow*, 2008 WL 906105, *2 (D. Colo. 2008)(Kane, J.) .

At the summary judgment stage, evidence need not be submitted in a form that would be admissible at trial, but its content or substance must be admissible. *Argo v. Blue Cross/Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1199 (10th Cir.2006). Thus, hearsay testimony that would not be admissible at trial in any form must not be considered at summary judgment. *Id.*; *Jaramillo v. Colo. Judicial Dep't,* 427 F.3d 1303, 1314 (10th Cir.2005).

## II. BACKGROUND.

The following facts are either undisputed or taken as true, viewing the record in the light most favorable to Plaintiff.

Margee Johnson was diagnosed with multiple sclerosis in June of 1994 or 1997. Weld County hired her as an Accounting Specialist in August 1998 and changed her title to Accountant I in 2001.[3] Her direct supervisor was Fiscal Officer Marilyn Carlino, whose official title was Administrator II/Finance Business Manager. Carlino's supervisor was Walt Speckman, Director of the Weld County Division of Human Services. Throughout her employ at Weld County, Johnson received performance evaluations indicating that she met or exceeded her job requirements. Also throughout her employ, there were no full-time male accountants at Weld County.

In late 2002, Johnson experienced a reaction to a substance sprayed on her Christmas tree, which activated her multiple sclerosis and temporarily caused her to lose

---

[3] Note that Weld County's materials use the titles interchangeably. According to Weld County, the titles represent a single position. Johnson presents no evidence to the contrary.

vision in one eye. At that time, Johnson informed Speckman she had multiple sclerosis. She requested and received accommodation for her condition, and so worked half days for two to three weeks. She was treated and recovered fully from the episode.

In February of 2005, Carlino resigned and Speckman offered the Fiscal Officer position to Johnson on an interim basis, with a corresponding five percent pay increase. Johnson accepted the temporary additional responsibilities and the temporary raise.

In April of 2005, Johnson applied to Weld County for the permanent Fiscal Officer position. The position called for a "Bachelor's Degree in Business Administration with an emphasis in Accounting." According to Johnson, she held a Bachelor's Degree with a minor in Accounting.[4] Three other female candidates applied, as did Dennis Bogott, a male candidate who held a bachelor's degree in "Business, double majoring in Finance and Accounting."

Weld County interviewed the five candidates on March 7, 2005. The Interview Committee consisted of Speckman and six women, including Barb Connolly (then Eurich). Each candidate was asked the same questions, in the same order, by the same member of the committee. The committee collectively ranked the candidates based on a points system, and each member voted either "recommend" or "do not recommend" as to each candidate. Candidates who received a "do not recommend" vote and also were not

---

[4]     The record indicates Johnson actually holds a bachelor's degree with a "Major – Business Administration: Computer Information Systems" and an Associate's Degree in Accounting, and that she completed several undergraduate Accounting courses (*See* Johnson Transcript, Def.'s Ex. A-8, p.1; Johnson Application, Def.'s Ex. A-6, p.1) Weld County does not dispute the accounting credentials are sufficient to satisfy the minor in Accounting that Johnson claims to hold. (*See* Johnson Dep., Pl.'s Ex. 1, 71:19-72:6.)

highly ranked by overall points received no further consideration.  Based on its rankings, the committee was to make a hiring recommendation to Human Services.  As Director of the Human Services Division, Speckman was responsible for the ultimate Fiscal Officer hiring decision.

In the final tally, a female candidate was ranked first, Bogott ranked second, and Johnson ranked fourth.  Johnson also had one "do not recommend" vote from Connolly.[5] The committee officially recommended the top two ranked candidates for hire.  After a background check, Weld County offered the Fiscal Officer position to Bogott.

When Bogott came on as Fiscal Officer in April 2005, Johnson continued to receive her five percent pay increase while she trained him and continued to perform some of the Fiscal Officer duties she had been performing.  Johnson contends Bogott was unskilled at his job and that she was doing his job for him.  She began complaining verbally to Bogott, in weekly meetings, that she was overloaded by the work.

One day that spring, Johnson contends Bogott suggested she "flirt" with the Employment Services auditors who were visiting the office, to help the county pass its audit.  After he did so again the next day, Johnson told Bogott to stop.  When he made the comment a third time on the following day, Johnson told him she would pursue the matter further if he persisted.  Bogott never made the comments again.  (*See generally*, Johnson Dep., Pl.'s Ex. 1, p. 48:15-50:20.)

---

[5]      Connolly's statement that, at the time of her vote, she did not know Johnson suffered from multiple sclerosis is uncontroverted in the record.

In June 2005, Johnson's colleague, J.J. Jarboon, quit his job and Johnson assumed some of his duties and then trained his successor, Linda Sandin. Meanwhile, Bogott still asked for Johnson's help with his job on a regular basis. Johnson felt she was doing the jobs of three people. She gave Carlino's email address to Bogott so he could direct some of his questions to his predecessor instead of to her. Johnson also complained verbally to Mr. Speckman about feeling overloaded and asked for him to bring in help. In July, Speckman and Bogott brought in an auxiliary worker from Head Start. These two measures lessened Johnson's load somewhat, but, she maintains, Bogott still required extensive assistance. (Johnson Dep., Pl.'s Ex. 1, pp.24-25; 43-46.)

In mid-August, Johnson asked for descriptions of the downtown office accountants' positions, so she could investigate her suspicion that she was eligible for an upgraded title and was thus being paid less than similarly situated male employees at the downtown office. She asked for Bogott's help obtaining those descriptions and he provided her with descriptions of Accountants I and II but not Accountant III. Johnson also asked Speckman and Bogott to evaluate her job title and determine whether she was entitled to an upgrade. Toward the end of the month, they responded that the county would not consider any changes until the next budget cycle. *See* Johnson Email, Def.'s Ex. A-14 (containing journal entries).

In late August, Bogott agreed Johnson was still training him as Fiscal Officer, and

got her five percent increased pay extended through the end of September.[6]  On August 30, 2005, Speckman sent Johnson a memo thanking her for performing the interim duties and saying that her performance in that capacity was good.  *See* Speckman Memo, Pl.'s Ex. 7.  That same day, Johnson requested specific job descriptions for her position and Bogott's, which Talmadge provided to her via email the following day.  *See* Job Descriptions, Pl.'s Ex. 12.

On September 8, 2005, Johnson emailed Pat Persichino at Weld County Human Resources with complaints that she was doing three jobs at once and had not been hired as Fiscal Officer even though Bogott seemed incapable of his job.  She also complained about a lack of clarity regarding how long she was entitled to increased pay and regarding the exact accounting title that she held and deserved at Weld County.  *See* Johnson Email, Def.'s Ex. A-14.  On September 20th, Persichino responded that he had determined Johnson's only grievable item was her temporary pay increase.  *See* Persichino Letter, Def.'s Ex. A-16.  Ms. Johnson responded with another email to Persichino on September 22d, followed by a complaint copied to Bogott and Speckman on September 26th that she felt she was a victim of discrimination.  *See* Johnson Email, Def.'s Ex. A-17.  That day, Johnson wrote in a journal entry that Bogott told her she was probably seeking legal counsel and that there was no need for a lawyer.  *See* Johnson Journal, Pl.'s Ex. 8.

Within a couple days of one of her September complaints, Johnson contends she

---

[6]     Although Weld County initially claimed Johnson was through training Bogott and revoked some portion of her supplementary pay, she ultimately retained the extra payment through September 2005.

began receiving the "cold shoulder" from Bogott and Speckman, who tried to avoid her. Also in September, Johnson began classes to train for a position at H&R Block. Her temporary pay increase finally ended on September 30, 2005.

On October 7, 2005, Johnson's lawyer wrote to Persichino, Speckman and Bogott, informing them that Johnson felt she was a victim of discrimination based on sex and disability. *See* Attorney Letter, Pl.'s Ex. 9. About that time Johnson contends Speckman and Bogott demanded that she perform "unethical" accounting tasks by reallocating employees' program hours on their timesheets, and that she objected. Johnson Dep., Pl.'s Ex. 2, pp.44-53.[7] Johnson continued to perceive hostility from Speckman and Bogott, whom she contends failed to sit beside her in meetings and criticized her job performance.

In mid-November 2005, Bogott submitted a performance evaluation of Johnson. Johnson characterizes the evaluation as containing negative comments, but concedes the overall rating of "Meets job requirements +" was the highest she had ever received while in Weld County's employ. *See* Performance Evaluations, Def.'s Ex. A-5; Johnson Dep., Pl.'s Ex. 1, pp.135-136. Later that month, Johnson filed a formal EEOC charge and notified Weld County of her discrimination and retaliation charge. *See* EEOC Charge, Pl.'s Ex. 4; Claim Notification, Pl.'s Ex. 10.

Johnson worked her job at H&R Block and her Weld County job from January 20,

---

[7]     Johnson says she was told to change Head Start timesheets from October through December 2005.

2006 to February 18, 2006. During that time, she stopped mentioning her outstanding grievances at her weekly meetings with Bogott. On March 20, 2006, her doctor recommended she take a month off work, and Johnson requested and received FMLA leave from Weld County. While on leave, she began to search for a new job.

Johnson returned to her job at Weld County in April 2006. On May 7, she complained again to Speckman about the "unethical" accounting orders. On May 8th, she received a response saying her concerns were neither substantive nor correct. *See* Speckman Memo, Def.'s Ex. A-19. In a meeting with Johnson shortly thereafter, Johnson contends Speckman exploded and yelled at her. Johnson tendered her resignation to Weld County on May 12, 2006, which was also her final day of work. She began work at Ball Corporation three days later. *See* Johnson Dep., Pl.'s Ex., pp.150-151. She filed the instant action on April 5, 2007.

### III. DISCUSSION.

Johnson concedes Weld County's Motion as to the unavailability of punitive damages against Weld County (Pl.'s Opp'n, Doc. 19) and summary judgment is granted as to that claim. Johnson also concedes Weld County's point regarding limitations on her ability to seek damages under Colorado state law. Under C.R.S. § 13-21-102(1.5)(a),[8] for

---

[8] "A claim for exemplary damages in an action governed by this section may not be included in any initial claim for relief. A claim for exemplary damages in an action governed by this section may be allowed by amendment to the pleadings only after the exchange of initial disclosures pursuant to rule 26 of the Colorado rules of civil procedure and the plaintiff establishes prima facie proof of a triable issue. After the plaintiff establishes the existence of a triable issue of exemplary damages, the court may, in its discretion, allow additional discovery on the issue of exemplary damages as the court deems appropriate." C.R.S.A § 13-21-1-2(1.5)(a).

example, Johnson may bring a claim for punitive damages only by amending her pleading, after initial disclosure and after establishing prima facie proof of a triable issue. Under C.R.S. § 24-34-405,[9] she may only seek back pay and reinstatement with respect to her claim for violation of Colorado law. On their merits, Johnson's state law employment discrimination claim under § 24-34-401, *et seq.*, rise or fall with her federal claims.

A. <u>Analytical Framework</u>.

Colorado and federal law apply the same standards to discrimination claims. *See McDonnell Douglas v. Green*, 411 U.S. 792, 802-804 (1973) (addressing Title VII claim); *Colo. Civil Rights Comm'n v. Big-O-Tires, Inc.*, 940 P.2d 397, 400 (Colo. 1997) (adopting *McDonnell Douglas* framework). Colorado's anti-discrimination statute closely parallels the language of its federal counterpart. *Colo. Civil Rights Comm'n*, 940 P.2d at 399; *see also* 10A C.R.S. § 24-34-402 (2008), 42 U.S.C. § 2000e-2(a) (1994).

Where a plaintiff relies on circumstantial, rather than direct, evidence to support a discrimination claim,[10] the burden-shifting framework set forth by *McDonnell Douglas Corp. v. Green* 411 U.S. 792 (1973) determines whether the plaintiff has raised an

---

[9] "In addition to the relief authorized by section 24-34-306(9), the commission may order a respondent who has been found to have engaged in an unfair or discriminatory employment practice to take affirmative action regarding: Back pay; hiring, reinstatement, or upgrading of employees, with or without back pay; the referring of applicants for employment by any respondent employment agency; the restoration to membership by any respondent labor organization; the admission to or continuation in enrollment in an apprenticeship program, on-the-job training program, or a vocational school; the posting of notices; and the making of reports as to the manner of compliance. The commission, in its discretion, may order such remedies singly or in any combination." C.R.S.A. § 24-34-405.

[10] Circumstantial evidence permits the fact finder to draw a reasonable inference from indirectly related facts that discrimination in fact occurred, whereas direct evidence demonstrates on its face that an employment action was discriminatory, such as existing policies that are discriminatory. *Adamson*, 514 F.3d at 1145 (internal citations omitted).

inference of unlawful discrimination sufficient to defeat summary judgment. *Adamson v. Multicommunity Diversified Servs.*, 514 F.3d AT 1145 (applying the framework to Title VII gender discrimination claim); *Mackenzie v. City and County of Denver*, 414 F.3d 1266, 1274 (10th Cir.2005) (applying the framework to ADA discrimination claim).

Under *McDonnell Douglas*, plaintiff must first establish a prima facie case of discrimination by showing that (1) she is member of a protected class; (2) she suffered adverse employment action; and (3) similarly situated employees were treated differently. *Trujillo v. Univ. of Colo. Health Services Ctr.*, 157 F.3d 1211, 1215 (10th Cir.1998).  If the plaintiff meets this burden, the defendant must articulate a legitimate, non-discriminatory reason for its decision.  *Jaramillo v. Colorado Judicial Dep't*, 427 F.3d 1303, 1307 (10th Cir.2005).  If the defendant meets its burden of production, plaintiff survives summary judgment only by showing that, more likely than not, the proffered explanations are a pretext for unlawful discrimination.  *See id.* (affirming summary judgment for employer where plaintiff did not sufficiently rebut proffered legitimate reason for employment action).

Here, Johnson claims that Weld County discriminated against her by failing to hire her as Fiscal Officer and also by constructively discharging her on the basis both of her sex and her disability.  She also claims that Weld County retaliated against her for complaining about the failure to hire and about what she perceived as unequal pay based on her gender.  In order to establish her prima facie cases of discrimination based on the adverse employment action of constructive discharge, she must first show that she was in

fact constructively discharged.  As the standards for analyzing retaliation claims and constructive discharge claims are closely related, I will address those two aspects of Johnson's complaint before moving on to her claims of discrimination based on the failure to hire or promote.

## B. Admissibility of Evidence.

The parties dispute the admissibility of evidence that affects the analysis of Johnson's claims at the summary judgment stage:  Johnson contends her own testimony provides direct evidence of intentional discrimination by Weld County in its decision not to hire her as Fiscal Officer,[11] whereas the county argues that the testimony in question is inadmissible hearsay.

In her deposition, Johnson testified to hearing from Ms. Burns and Mr. Willoughby that Mr. Speckman said she was not hired as Fiscal Officer because of her gender. *See* Johnson Dep. 22:2-24:4 (describing a statement attributed to Speckman by Burns that Johnson did not get the job because she was a woman); *id.* at 27:2-20 (stating that at some time after May 2005, Willoughby told her Speckman admitted the same to him).  According to Johnson, Bogott also told her that Speckman said she was rejected because she was a woman and because she had MS.  *Id.* at 25:8-24.  Johnson argues these

_____

[11]        In this situation, evidence of discrimination would be direct if it showed on its face that the Weld County decided not to promote Ms. Johnson because of her gender and/or because of her multiple sclerosis.  See *Ramsey v. City and County of Denver*, 907 F.2d 1004, 1008 (10th Cir.1990).   The McDonnell Douglas test is inapplicable where the plaintiff presents direct evidence of discrimination.  *Id. at* 1007 (quoting *Trans World Airlines, Inc., v. Thurston*, 469 U.S. 111, 121 (1984)).  Thus, direct evidence would enable Ms. Johnson to defeat summary judgment, and would obviate her need to establish a prima facie case of discrimination and to raise an inference that Weld County's proffered explanation for its decision is pretext for illegal discrimination, at this stage.  *See Ramsey*, 907 F.2d at 1007-8.

statements are competent evidence for purposes of Fed. R. Civ. P. 56(c) because each constitutes an admission of a party-opponent under Fed.R.Evid. 801(d)(2)(D).

Under Rule 801(d)(2)(D), a statement is not hearsay if it is offered against a party and is a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship. Fed.R.Evid. 801(d)(2)(D). For a statement to qualify as an admission of a party opponent, the speaker must be involved in the decision-making process affecting the relevant employment action. *Jaramillo*, 427 F.3d at 1314. Johnson stresses that Speckman was involved in the decision not to hire her and that the hiring decision was ultimately his as the Director of Weld County's Division of Human Services. In as much, his statements to Burns, Willoughby and Bogott independently pass muster under 801(d)(2)(D).

Speckman, however, is only the first speaker in the chain. Bogott, Burns and Willoughby each relayed Speckman's comments to Johnson. As Weld County points out, Johnson must establish admissibility of each of the statements made to *her*. *See* Fed.R.Evid. 805. Technically, Speckman's remarks as offered by Ms. Johnson are not "hearsay within hearsay" because, under 801(d)(2)(D), his statements are not hearsay at all. Nonetheless, testimony of a "double hearsay flavor" is an admissible admission of a party-opponent only if each subsequent speaker's statement meets the standard independently. *See Fischer v. Avanade, Inc.*, 519 F.3d 393, 405 n.4 (7th Cir.2008) (applying 801(d)(2)(D) and requiring that statements at each link of the chain be within scope of respective declarant's agency or employment); *see also Breneman v. Kennecott*

*Corp.*, 799 F.2d 470, 473 (9th Cir.1986) (finding statements not within scope of employment where declarants relating what decision maker said were not involved in the company's discharge of plaintiff). Failing this, each statement must be admissible under an exception to the hearsay rule. *See Regan-Touhy v. Walgreen Co.*, 526 F.3d 641, 650-51 (10th Cir.2008) (holding plaintiff's testimony inadmissible because she failed to point to any hearsay exceptions for segments of the chain not constituting admissions by party-opponents). Unless each link in the chain of communication is independently admissible, Johnson's testimony about Speckman's remarks would be inadmissible hearsay at trial, and is not competent evidence at summary judgment. *See Jaramillo*, 427 F.3d at 1314.[12]

Neither Burns, Bogott, nor Willoughby was involved in the decision-making process for hiring a Fiscal Officer.[13] Accordingly, their statements to Johnson are not rule 801(d)(2)(D) admissions of a party opponent. *See Jaramillo*, 427 F.3d at 1314. Ms.

---

[12] To argue that her testimony is sufficient direct evidence to defeat summary judgment, Johnson relies heavily on an unreported case that makes no mention of Fed.R.Evid. 801(d)(2)(D). *See Riffel v. Oklahoma Gas & Elec. Co,* 141 F.3d 1185, 1185 (10th Cir.1998) (reversing summary judgment for employer based on direct evidence of discrimination, in the form of witness co-worker's testimony about comments he heard from supervisor about plaintiff). (See Pl.'s Opp'n, Doc. 19, p.16.) The case is not directly applicable because Johnson's testimony contains a link in the chain that the *Riffel* testimony did not. There, a witness recounted comments that he himself heard from the plaintiff's supervisor. *See id.* at 1185. Here, Ms. Johnson seeks to use her own testimony, and she herself did not hear Speckman make the remarks in question.

[13] Willoughby was an auditor with the Department of Labor. (Johnson Dep., Pl.'s Ex.1, p.27:2-3 and 30:2-3.) Burns was an accounting technician in Johnson's department. (*Id.*, 20:4-12.) Neither was on the Interview Committee on 7 March 2005. (*See* Interview Docs., Pl.'s Ex. 13, p.2.) Bogott, of course, was a candidate for the position. Because none of them were involved in the decision not to hire Johnson, their statements fall outside the scope of their employment for the purpose of 801(d)(2)(D). *See Breneman*, 799 F.2d at 473.

Johnson does not contend that the statements fit any hearsay exception,[14] and I do not discern any exception that applies under Rules 803-807 of the Federal Rules. *See Regan-Touhy*, 526 at 650-51. As a result, I conclude Johnson's testimony regarding Speckman's allegedly discriminatory statements, as recounted to her by Burns, Bogott and Willoughby, constitutes inadmissible hearsay and may not be considered at summary judgment. *See Jaramillo*, 427 F.3d at 1314.[15] Accordingly, in the absence of direct evidence of discrimination, Ms. Johnson's discrimination claims proceed under the *McDonnell Douglas* burden-shifting framework. *See Adamson*, 514 F.3d at 1145.

C. Retaliation Claim.

To establish a prima facie case of retaliation without direct evidence of retaliatory intent, Johnson must show that: (1) she engaged in protected opposition to discrimination; (2) she suffered what a reasonable employee would have found to be a materially adverse action by the employer; and (3) a causal connection existed between the protected opposition and the materially adverse action. *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir.2006) (citing *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006)).[16] The standard applies to retaliation claims under both

---

[14] Nor does she contend that any of the speakers are unavailable as witnesses. *See* Fed.R.Evid. 804.

[15] Johnson is also alerted that her testimony could be categorized as an intentional sham fact issue. Generally, when an affidavit conflicts with prior sworn statements, it may be disregarded at summary judgment if it appears to constitute an attempt to create a sham fact issue. *Persichitte v. Bd. of Trustees of Univ. of N. Colo.*, Slip Copy, 2007 WL 218781 (D. Colo. 1986) (citing *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir.1986)).

[16] Under *Burlington*, materially adverse actions are "not limited to discriminatory actions that affect the terms and conditions of employment." 548 U.S. at 63 (describing scope of Title VII anti-

Title VII and the ADA, as the two statutes' anti-retaliation provisions contain essentially the same language. *Proctor v. United Parcel Service*, 502 F.3d 1200, 1208 n.4 (10th Cir.2007); see 42 U.S.C. § 2000e-3(a); 42 U.S.C. § 12203(b).

Johnson cannot establish a prima facie case of retaliation. She fulfills only the first prong of her prima facie case. One action that she cites as evidence of retaliation escapes analysis under the second prong because it utterly fails under the third. The rest of the allegedly retaliatory actions she identifies fail to meet the objective test of material adversity under the second prong.

*Protected opposition to discrimination.*

Filing a formal EEOC charge is protected opposition to discrimination that fulfills the first element of a retaliation claim. *See, e.g., Proctor*, 502 F.3d at 1208 (indicating that filing an EEOC claim is a protected activity, as a matter of law). Informal complaints of discrimination to one's superiors may also constitute protected activity. *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1213 (citing *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004)).

It is undisputed that Johnson engaged in protected activity when she filed her claim with the EEOC on November 28, 2005. It is also undisputed that Johnson made several verbal and written complaints to Messrs. Persichino, Speckman and Bogott in

retaliation provision); *see also Proctor,* 502 F.3d at 1208 (applying *Burlington* to ADA retaliation claim). Thus, Johnson's retaliation claim can stand alone based on alleged materially adverse actions; it does not hinge on the success of her constructive discharge claim.

September and October of 2005. Viewing these actions in the light most favorable to Johnson, they satisfy the first element of her prima facie claim for retaliation.

*Adverse action.*

An employer's action is materially adverse if it might well dissuade a reasonable employee from making or continuing a charge of discrimination. *Proctor*, 502 F.3d at 1208 (quoting *Burlington*, 548 U.S. at 68). A lack of good manners does not rise to this level. *Somoza,* 513 F.3d at 1219 (quoting *Burlington*, 548 U.S. at 68). Notwithstanding *Burlington's* objective standard, the fact that an employee continues to pursue a remedy for discrimination can be probative of whether a reasonable person might be deterred by the employer's actions. *Somoza* at 1214.

Johnson alleges five materially adverse actions Weld County took in response to her actions in the fall of 2005 in filing an EEOC complaint and making complaints to superiors and coworkers about discrimination: (1) Speckman and Bogott's cold shoulder treatment of her immediately thereafter; (2) Speckman and Bogott's later "open hostility" towards her in the form of teasing and criticism of her work; (3) Bogott's assertion involving an attorney was unnecessary; (4) the refusal by Speckman and others to investigate her discrimination complaints; and (5) Speckman and Bogott's purposeful attempts to "increase her stress level" knowing they could aggravate her multiple sclerosis symptoms, by bypassing her in daily duties and by insisting that she perform unethical accounting practices. Johnson offers little factual support for these allegations,

and those for which support exists are not sufficient as a matter of law to support the necessary inference.

In her deposition, Johnson testified Bogott "kind of sat further away from [her]" at their weekly meetings (Johnson Dep., Pl.'s Ex. 2, 38:14-15) and became "too busy" to answer her work-related questions (Johnson Dep., Pl.'s Ex. 2, 41:4-6), and asserted Speckman generally stopped saying hello and making eye contact (Johnson Dep., Pl.'s Ex. 2, 59:10-11). Being given the "silent treatment" or other forms of passive action does not, as a matter of law, constitute a materially adverse action for purposes of retaliation. *See Mackenzie v. City and County of Denver,* 414 F.3d 1266, 1279 (10th Cir.2005). *See also Steele v. Kroenke Sports Enterprises, L.L.C.,* 264 Fed.Appx. 735, 746 (10th Cir.2008) (holding that supervisor's alleged snubbing of employee was not materially adverse). Johnson's allegations regarding the "cold shoulder" and other passive forms of alleged mistreatment are insufficient, under governing legal standards, to satisfy the second element of a prima facie case of retaliation by themselves.

Next, Johnson claims she suffered materially adverse action in the form of teasing from Speckman and Bogott. I address this issue *infra* primarily as it relates to the causation element of Johnson's retaliation claim, because the only instances of teasing in record took place before Johnson's protected actions in the fall of 2005. (Johnson Dep., Pl.'s Ex. 1, 49:16-17.) Nonetheless, note that *Burlington* described "the sporadic use of abusive language, gender-related jokes, and occasional teasing" as "ordinary tribulations of the workplace" rather than materially adverse actions. 548 U.S. at 68. *See also*

*Somoza v. Univ. of Denver*, 513 F.3d 1206, 1219 (10th Cir.2008) (affirming summary judgment for employer despite testimony that employees endured various instances of incivility, rudeness, and allegedly offensive statements).

Johnson's assertions regarding increased criticism of her work by Speckman and Bogott are unsupported by any specific factual references and Johnson offers no specific examples of such criticism. The only evidence in the record is to the contrary, because Johnson received the most positive performance review of her career at Weld County in November of 2005. (Johnson Dep., Def.'s Ex. A-1, 139:12-21; Performance Review, Def.'s Ex. A-4.)[17] In her deposition, Johnson suggests she was also criticized in front of coworkers, although she provides no concrete example. (Johnson Dep., Pl.'s Ex. 2, 62:6-7.) Even taking this allegation at face value, oral reprimands or derogatory comments are not materially adverse actions absent additional facts suggesting they were prolonged or affected the targeted individual's authority. *Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1214 (10th Cir.2003) ("unsubstantiated oral reprimands" and "unnecessary derogatory comments" are not materially adverse actions, at least not unless they cause a severe or prolonged loss of authority). *See also Somoza*, 513 F.3d at 1215 n.2.

Johnson's fourth assertion is that Bogott took adverse action against her by pressuring her not to retain an attorney. On the day Johnson emailed Persichino, Speckman and Bogott to say she felt she was a victim of discrimination, she wrote in her

_____

[17] Johnson testified to perceiving negativity in the overall positive evaluation because in it Bogott failed to acknowledge the extra work she did in training both him and Ms. Sandin, and in filling in for Mr. Willoughby. Nonetheless, Johnson agreed the evaluation contained no objectively negative comments. (Johnson Dep., Pl.'s Ex. 1, 136:18-25.)

journal:

> [Bogott] indicated to me that I probably was talking to an attorney. He told me that there was no reason for an attorney since the issue was resolved. My pay was being addressed in my next paycheck, and that according to Speckman] there are no other grievances.

(Johnson Journal, Pl.'s Ex. 8.)  An employer's mere suggestion that the parties work out a satisfactory resolution without involving lawyers is insufficient to support an inference of adverse action for purposes of summary judgment. *Garrison v. Gambro* 428 F.3d 933, 938 (10th Cir.2005) (employer's statement "let's not get the lawyers involved with this" was not a materially adverse employment action, as a matter of law).  The assertion in Johnson's journal is clearly within this category and will not support the second element of the prima facie case.

There is no evidence to support Johnson's fourth assertion of adverse action, i.e., that Weld County "failed" to investigate her complaints.  The only facts in the record are to the contrary, in that both Persichino and Elton responded to Johnson's complaints (Persichino Letter, Def.'s Ex. A-15; Elton Letter, Def.'s Ex. A-18) and Speckman, on behalf of the Human Services Division, responded to her concern about improper accounting allocations (Speckman Memo, Def.'s Ex. A-19).

Finally, Johnson claims she experienced a materially adverse action in that Speckman and Bogott purposefully attempted to "increase her stress" knowing it could exacerbate her multiple sclerosis symptoms.  Again, the record provides no basis for this untoward accusation, and the allegation itself speaks more to a claim for outrageous

conduct (which is not asserted) than employment discrimination. Johnson simply contends both men knew she suffered from multiple sclerosis (Johnson Dep., Pl.'s Ex. 1, 124:1-15; Johnson Dep., Pl.'s Ex. 2, 27:6-23) and that both knew stress was a complicating factor in that condition. Her *ipse dixit* conclusion, based on these facts, is that any actions the two undertook thereafter that caused her stress were taken for the purpose of exacerbating her MS. The conclusion is not only unsupported by any actual facts in the record and strains credulity, but it also finds no nexus whatever to the protected employment activity that ostensibly triggered it. Moreover, the evidence in the record is that, in response to her informal complaints about her workload and her requests for help, Speckman and Bogott hired an auxiliary worker from Head Start and reduced Johnson's workload as she requested by addressing certain work-related questions to Carlino instead of Johnson. (Johnson Dep., Pl.'s Ex. 1, 42:6-9; 43:4 - 44:5; 45:5-6.)

Although Johnson does not make the argument, I also consider whether her experience was materially adverse in the aggregate. *See Somoza*, 513 F.3d at 1219 (10th Cir.2008) (suggesting that aggregated actions can rise to the level of being materially adverse under *Burlington*). In the absence of sufficient aggregate facts to create an inference that a reasonable employee would be dissuaded under these circumstances from pursuing a discrimination claim, *see Burlington*, 548 U.S. at 68, I conclude it was not.

In *Somoza*, the Tenth Circuit affirmed the entry of summary judgment against a retaliation claimant, holding that negative comments, condescending looks, perceived exclusion from hiring and firing decisions, and a reduction in the employee's

departmental authority did not aggregate to produce a materially adverse action. *Id.* at 1219. In addition, the court observed that a claimant's continued pursuit of discrimination claims even after the aggregate adverse actions are alleged to have taken place is probative of the facts that they were not material. *See id.* at 1214. In the instant case, Johnson continued to pursue her discrimination claim despite the occurrence of the various adverse actions alleged.

Johnson's inability to satisfy the second element of her prima facie case obviates the need to address the third, which requires the existence of facts suggesting a causal connection between the "adverse action" and the protected activity. If no adverse actions are established, then no purpose exists to inquire into the link between those "actions" and the employee's protected activity. *C.f. Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999)(temporal proximity between an employee's protected activity and employer's materially adverse actions may raise inference of retaliatory intent sufficient to establish prima facie case); *Burlington*, 548 U.S. at 68 (employer's conduct before protected activity irrelevant to retaliation claim).

D. Discrimination Claims.

As previously set forth, Johnson's gender and disability discrimination claims are premised on two separate discriminatory acts: (1) her claim that she was constructively discharged as a result of gender and/or disability-bias; and (2) her claim that her non-selection for the Fiscal Officer position was the result of gender and/or disability discrimination. Because the facts in the record are insufficient to support the assertion

22

that Johnson was constructively discharged under any theory of invidious discrimination, Johnson's claims for employment discrimination are limited to Weld County's decision to hire Bogott rather than her for the Fiscal Officer position.

*Constructive Discharge.*

Constructive discharge occurs when an employer deliberately makes working conditions so intolerable that a reasonable employee would feel forced to resign. *Mackenzie*, 414 F.3d at 1281. "The plaintiff's burden in establishing constructive discharge is substantial." *Fischer v. Forestwood Co., Inc.*, 525 F.3d 972, 980 (10th Cir.2008). To survive summary judgment, an employee must allege facts sufficient to show that a reasonable person in her position would have found the working conditions intolerable. *Heno v. Sprint/United Management Company*, 208 F.3d 847, 858 (10th Cir.2000). The employee cannot survive summary judgment merely by showing that working conditions were difficult or unpleasant. *Fischer*, 525 F.3d at 981. She must show the conditions were so severe that resignation was objectively involuntary. *Exum v. U.S. Olympic Committee*, 389 F.3d 1130, 1135-36 (10th Cir.2004) (affirming summary judgment for employer and noting the Tenth Circuit has held that even requiring an employee to choose between resignation and termination is not necessarily constructive discharge, unless employee's decision is somehow involuntary). An employee's subjective feelings or beliefs are irrelevant to the constructive discharge claim. *Heno*, 208 F.3d at 858.

The facts marshaled by Johnson, even under a most liberal view, do not rise to the

level of constructive discharge. They are essentially the same facts on which she bases her retaliation claim which, if they were inadequate to support an inference that a reasonable employee in her position would be deterred from pursuing a discrimination claim also are inadequate to support an inference that work conditions were so intolerable that the employee would feel compelled to resign. *See Heno*, 208 F.3d at 858 (affirming dismissal of constructive discharge and retaliation claims where both relied on the same body of evidence).[18] Johnson's additional assertions that she suffered "emotional distress" (Pl.'s Opp'n to Def.'s Motion for Summary Judgment, p.30) and believed she had "no choice" but to resign (*id.* at 31) are simply conclusory assertions, neither of which is sufficient alone or in the aggregate to support a constructive discharge claim on summary judgment. Specifically, Johnson contends Speckman and Bogott avoided her and gave her the silent treatment, teased her and criticized her work, bypassed her to ask questions of Ms. Sandin, demanded she perform unethical accounting, and intentionally increased her stress knowing it could affect her multiple sclerosis.

Teasing does not suffice to support an inference that an employee's working conditions were "intolerable." Johnson's examples, that Bogott suggested three times that she "flirt" with visiting auditors to help the office pass its audit, are clearly

---

[18]     *Heno* applied an "adverse employment action" standard to retaliation claims, whereby retaliatory conduct was actionable only if it adversely altered the employee's compensation, terms, conditions, privileges, or status of employment. *Id.* at 857; *cf. Burlington*, 548 U.S. at 63, 126 S.Ct. at 2412-13 (declaring that materially adverse actions need not affect terms and conditions of employment). Since some "materially adverse actions" under *Burlington* would not have been actionable in *Heno*, the proposition that given evidence which fails to show retaliation also fails to show constructive discharge is even more logical under current Tenth Circuit law.

inappropriate for the workplace, but fall short of the stringent standard for constructive discharge. *See EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 794 (10th Cir.2007) (holding that, as a matter of law, conditions were not intolerable where employer repeatedly subjected female employee to sexually explicit and derogatory remarks). Moreover, Bogott ceased this line of "teasing" when Johnson asked him to stop and Johnson offers no evidence to support an inference that it would have resumed had she not left Weld County. *See Buchanan v. Sherrill*, 51 F.3d 227, 229 (10th Cir.1995) (affirming summary judgment for employer where employer ended alleged harassment and there was no evidence raising inference that harassment would have continued, but employee resigned anyway).[19] Here, the teasing occurred in the Spring of 2005 and ended when Ms. Johnson told Mr. Bogott she would pursue the matter further if it happened again. (Johnson Dep., Pl.'s Ex. 1, 48:2-49:17; 50:14-17.) Ms. Johnson resigned from Weld County one year later. (Resignation letter, Pl.'s Ex. 11)

Johnson's contention that the unethical accounting directives she received from Speckman and Bogott and their actions in bypassing her in favor of Sandin constitute independent facts sufficient to support her constructive discharge claim also fails. Unethical orders, without more, do not create objectively intolerable working conditions. *See Exum*, 389 F.3d at 1136 (affirming summary judgment for employer where employee resigned without complying with unethical order, noting that employee could have either chosen to comply or refused to comply and faced possible consequences). Because the

---

[19]     *Buchanan* applied Oklahoma constructive discharge law, which uses the same standards as Colorado. 51 F.3d at 229.

bypassing of Johnson for Sandin was insufficient to support an inference of material adversity for purposes of Johnson's retaliation claim, it is likewise insufficient, without more, to establish objective intolerability. *See Heno*, 208 F.3d 847 at 858.

With respect to the assertion that Speckman and Bogott intentionally increased her stress knowing it could aggravate her multiple sclerosis, again the statement is conclusory and supports no plausible inference of employment discrimination. Johnson's subjective belief about her superiors' intent is irrelevant to her constructive discharge claim, *see Heno*, 208 F.3d at 858, and evidence that Johnson experienced stress from her job and suffered health problems as a result is inapposite unless it is causally linked to some discriminatory animus. *See Exum*, 389 F.3d at 1136 n.7.

Johnson's facts are insufficient under a summary judgment standard to support an inference of constructive discharge.

*Failure to Hire.*

In the absence of a viable cause of action for retaliation or constructive discharge, the sole remaining basis for Johnson's claims of discriminatory treatment is Weld County's failure to hire her for the Fiscal Officer position in April 2005. Johnson claims Weld County's decision was motivated both by gender and disability discrimination under Title VII and the ADA, respectively.

E. Disability Discrimination - ADA Claim.

The ADA prohibits employment discrimination on the basis of disability, stating that "[n]o covered entity shall discriminate against a qualified individual with a disability

26

because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112. At the summary judgment stage, a plaintiff establishes a prima facie case of discriminatory failure to hire with facts tending to demonstrate: (1) plaintiff was "disabled" as defined by the ADA; (2) plaintiff was qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) plaintiff was not hired for the position because of plaintiff's disability. *See Mackenzie*, 414 F.3d at 1274 (quoting *Aldrich v. Boeing Co.*, 146 F.3d 1265, 1269 (10th Cir. 1998)). If plaintiff raises a genuine issue of material fact on each element of her prima facie case, the burden of production shifts to the defendant to offer a nondiscriminatory reason for its employment action. *Id.* If defendant does so, plaintiff must present evidence tending to show defendant's proffered reasons are pretextual or otherwise creating an inference that the non-hiring decision was motivated by discriminatory animus. *See id.* Weld County denies Johnson is "disabled" within the meaning of the ADA and therefore that she cannot establish her prima facie case.

The ADA defines disability as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Johnson contends she is "disabled" under all three subsections; Weld County denies this, and moves for summary judgment on that basis.

*Actual substantial impairment of a major life activity.*

To meet the first definition of "disability," plaintiff must demonstrate that a recognized impairment substantially limits her ability to perform one or more major life activities. *See Doebele v. Sprint/United Management Co.*, 342 F.3d 1117, 1129 (10th Cir.2003) (citing *Bristol v. Bd. of County Comm'rs,* 281 F.3d 1148, 1158 (10th Cir.) *rev'd in part on other grounds*, and *Poindexter v. Atchison, Topeka & Santa Fe Ry.,* 168 F.3d 1228, 1230 (10th Cir.1999)). Major life activities include but are not limited to caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working. *See* C.F.R. § 1630.2(i); 29 C.F.R. § 1614.203(a)(3). The court is to analyze only those impairments and life activities that the plaintiff articulates with precision. *Doebele* at 1129. Whether the plaintiff has a recognized impairment and whether the identified activity is a major life activity are questions of law for the court to decide. *Id.* Whether the impairment substantially limits the major life activity is generally a question for the jury, but can be resolved on summary judgment in proper circumstances. *Id.* at 1129 and 1130 n.5; *Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1216 (10th Cir.2007).

An impairment substantially limits a major life activity if it is permanent or long term and it prevents or severely restricts an individual from doing activities that are of central importance to most people's daily lives. *Berry*, 490 F.3d at 1216 (quoting *Toyota Motor Mfg., Ky. Inc., v. Williams*, 534 U.S. 184, 198 (2002)). At summary judgment, the question is whether the evidence presented could allow a reasonable jury to conclude that the limitations have that effect. *Id.* at 1217.

Here, Johnson asserts her multiple sclerosis[20] constitutes an impairment that substantially limits her in several major life activities, including sleeping, seeing, being fatigued or overheated, being in the sun, having normal memory and not progressing toward dementia, and being free of migraine headaches, neurological disorders, depression and muscle spasms. (*See* Opp'n to Mot. Summ. J. (Doc. 19) pp.17-18.) As an initial matter, Johnson conflates concepts of impairment and major life activity, asserting her headaches, memory lapses and physical restrictions, for example, impair her in the major life activities of "being free" of headaches or having "normal" memory or being able to live without such restrictions. As a matter of law, the ability to exert one's self physically is not a major life activity except to the extent it affects one's ability to work. *Mackenzie*, 414 F.3d at 1275 (citing 29 C.F.R. § 1630.2(i).) With respect to Johnson's contentions that her MS substantially limits her by requiring she avoid fatigue, overheating, and being in the sun, for example, Johnson does not identify the major life activity affected by these doctor-recommended limitations, but her uncontroverted testimony is that these restrictions did not affect her work at Weld County. (*See* Johnson Dep., Def.'s Ex. A-1, 119:14-18; 120:16-23.)

The same holds true for Johnson's assertion that her MS impairs her by giving her headaches. The ability to live free of headaches is not a major life activity in the abstract, and must be linked to one before an inference that her MS is disabling will arise. No such

---

[20]     The Tenth Circuit treats multiple sclerosis as an amalgam of its symptoms. *See, e.g., Croy v. Cobe Laboratories, Inc.*, 345 F.3d 1199 (10th Cir.2003) and *Berry*, 490 F.3d. (assessing whether plaintiffs' multiple sclerosis symptoms substantially limited major life activities, without addressing whether the disease is a recognized impairment).

evidence appears in the record.

As for her depression, the only evidence in the record is that Johnson's depression was the result of her experience at Weld County, not her MS. (*See* Johnson Dep., Pl's Ex. 217, 18-22.) Even if one infers such a link, Johnson offers no evidence that her depression substantially impaired her in any identified major life activity.

It is true that Johnson must monitor her stress levels as a result of her multiple sclerosis, as the stress can reactivate her multiple sclerosis symptoms. (See Johnson Dep., Pl.'s Ex. 1, 64:20-25.) The need to monitor stress, however, is insufficient by itself, to create an inference that plaintiff suffers from an impairment that substantially limits her in a major life activity under the ADA. *See Siemon v. AT&T Corp.*, 117 F.3d 1173, 1176 (10th Cir.1997) (affirming summary judgment for employer where plaintiff had to avoid some unknown level of stress and her disability claim focused on the actions of her supervisor).

To the extent Johnson identifies recognized "major life activities" that are limited by her MS symptoms – i.e. sleeping, thinking and seeing – the evidence is insufficient to permit an inference that the limitations on her ability to perform or enjoy those activities as a result of those impairments was "substantial."

In January 2000, for example, Johnson reported difficulty with her memory and her doctor suggested medication to prevent dementia in the long term. (*See* Medical Records, Pl.'s Ex. 6, p.5.) In 2006, her doctor wrote that her short term memory was normal. (*See id.*, p.1.) No other reference to any memory/dementia problems occurs in

the record.  With respect to the effect of her MS on the major life activity of seeing, Johnson claims her MS caused her vision trouble but does not demonstrate that the trouble was long term or permanent.  The record shows she lost sight in one eye due to a reaction to a substance on a Christmas tree, that the reaction was related to her multiple sclerosis, and that she was treated via IV over a period of two to three weeks in 2002 or 2003 and recovered fully.  (See Johnson Dep., Pl.'s Ex. 1, 123:18-124:2; 126:13-14, 233:18-20; Medical Records, Pl.'s Ex. 6, p.1.)

There is also no evidence that Johnson's muscle spasms and limited range of motion in her neck and shoulders were long term or permanent.  She experienced the trouble in 2000; medical records from 2001 indicate her range of motion had improved; and records from 2006 makes no mention of the issue.  (See Medical Records, Pl.'s Ex. 6, p.1-5.)

With regard to the need to monitor her stress levels because stress can reactivate her multiple sclerosis symptoms, such a need is insufficient, by itself, to create an inference of disability under the ADA.  *See Siemon v. AT&T Corp.*, 117 F.3d 1173, 1176 (10th Cir.1997) (affirming summary judgment for employer where plaintiff had to avoid some unknown level of stress and her disability claim focused on the actions of her supervisor).

In *Croy v. Cobe Laboratories*, the Tenth Circuit affirmed the entry of summary judgment against an employee whose MS symptoms imposed numerous restrictions on her daily life activities.  Plaintiff's MS required her to take unscheduled absences from

work, limit heavy lifting, refrain from sustained exertion, and from completing household chores. *See Croy*, 345 F.3d at 1204. The Court held plaintiff was not substantially limited in the major life activity of working because the record demonstrated she was able to maintain a satisfactory level of performance. *Id.*, *see also Berry*, 490 F.3d at 1218 (holding that a plaintiff with multiple sclerosis was not disabled as a matter of law where she could perform all daily life activities given enough rest, could walk with the aid of a cane, received benefit from treating symptoms with medication, her cognitive difficulty did not prevent her from learning and working, and her condition had not significantly degenerated over the last several years, according to her physician). Based on the foregoing, the record in this case affords no basis to infer that Johnson meets the first definition of "disabled" under 42 U.S.C. § 12102(2)(A).

To the extent Johnson attempts to salvage her status under § 12102(2)(A) by characterizing her disability as being substantially limited in the major life activity of working, (*see* Opp'n to Motion, Doc. 19, p.17) I note the illogic of the assertion where her discrimination claim is premised on the failure to hire. Such a claim is specifically premised on the assertion that the plaintiff is qualified for and desires the position for which she applied and was rejected. A plaintiff claiming to be disabled in the major life activity of working cannot also claim she was discriminated against on the basis of that disability because she was not hired for a job she desired and for which she claims to have been qualified.

Moreover, to show substantial limitation of the major life activity of working, a

plaintiff must present evidence that she is unable to perform either a class of jobs or a broad range of jobs in various classes. *See Doebele*, 342 F.3d at 1133 (citing *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 491-92 (1999) and 29 C.F.R. pt. 1630, App. § 1630.2(j)(3)(i)). The record reveals no such evidence. To the contrary, the evidence in the record is that Johnson continued to perform her job despite her MS symptoms, received an overall performance evaluation of "Meets job requirements +" from Mr. Bogott in 2005 (*see* Performance Evaluations, Pl.'s Ex. 5, p.1), and wanted to continue working at Weld County in the position of Fiscal Officer. Finally, Johnson expressly testified that her disease did *not* impair her ability to work for Weld County. (Johnson Dep., Pl.'s Ex. 1, 26:4-12).

Johnson has failed to establish she suffered a physical or mental impairment that substantially limits one or more major life activities.

*A record of disability.*

"To have a record of an impairment that substantially limits a major life activity, a plaintiff must have a history of, or been misclassified as having, an impairment that substantially limited a major life activity." *Doebele*, 342 F.3d at 1132. The record supports no inference of such a history or misclassification.

*Regarded as having a disability.*

A plaintiff meets this definition of disability if her employer mistakenly believes she has a physical impairment that substantially limits one or more major life activities, or mistakenly believes an impairment is substantially limiting impairment when in fact it is

not. *Doebele*, 342 F.3d at 1132-33. The employer's mistaken belief must be that plaintiff was significantly restricted in the ability to perform a class of jobs or a broad range of jobs in various classes. *Id.* at 1133. Again, there is no evidence in the record to permit such an inference.

Johnson's assertion that Weld County "regarded" her as disabled under 42 U.S.C. § 12102(2)(C) is premised on her own testimony that Speckman told Bogott, who in turn reported to Johnson, that Johnson was not hired as Fiscal Officer because of her gender and her MS, *see* Opp'n to Mot. Summ. J. (Doc 19) at 17, and because Speckman viewed her as incapable of handling stress. Neither assertion, even if admissible, supports the necessary inference.

Because the record permits no inference that Johnson was "disabled" under any definition of that term in the ADA, her claim that Weld County's decision to hire Bogott instead of her for the Fiscal Officer position was the result of disability discrimination fails as a matter of law.

F. <u>Sex Discrimination - Title VII Claim</u>.

*Prima facie case.*

A prima facie case of discrimination in a failure to hire case is established if plaintiff (1) falls withing the protected class (i.e., is a woman); (2) applied and was qualified for the particular position; (3) she was not hired despite her qualifications; and (4) the position was filled by another or remained open after she was rejected. *See Jaramillo*, 427 F.3d at 1306-07; *Notari v. Denver Water Dep't*, 971 F.2d 585, 588 (10th

Cir.1992). The only element of the prima facie case Weld County disputes is the third, when it denies Johnson was qualified for the position. For purposes of summary judgment, I will presume Johnson has established her prima facie case.[21]

Under the *McDonnell Douglas* framework, then, I turn to Weld County's stated grounds for its hiring decision and Johnson's evidence of pretext to determine whether Johnson has raised a sufficient inference that the County's failure to hire her for the Fiscal Officer position was gender-based. *See Jaramillo*, 427 F.3d at 1307.

Weld County points to the extended hiring process and the candidates' respective qualifications and performance rankings from the interviews to explain that the reason Johnson was not hired for the position was not her gender (or her multiple sclerosis) but because she ranked below several candidates for the position, including Mr. Bogott. Johnson contends procedural irregularities in the hiring process and the use of subjective criteria cast doubt on this stated grounds for Weld County's decision not to hire her, supporting an inference of gender bias sufficient to withstand summary judgment. I disagree.

*Pretext.*

Pretext in an employment discrimination case may be shown by demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the

---

[21] Weld County contends Johnson was ineligible for consideration because Connolly's vote of "do not recommend" rendered her ineligible for consideration. (*See* Motion, Doc. 12, p. 18.) Johnson was as eligible for consideration as any of the other candidates who had granted an interview, and I decline to give the County's assertion any traction under a summary judgment standard.

employer's proffered reasons for its employment action that a reasonable factfinder would deem them unworthy of credence. Doubt that the employer acted for the nondiscriminatory reasons proffered, in turn, supports an inference that the real reason for the action was invidious discrimination. *See Trujillo v. PacifiCorp*, 524 F.3d 1149, 1158 (10th Cir.2008). At the summary judgment stage, the relevant question is whether a reasonable jury could conclude that it does not believe the employer's proffered reason, or that invidious discrimination is the more likely motivation behind the employer's action. *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Services*, 165 F.3d 1321, 1328-1329 (10th Cir.1999).

Evidence of pretext includes but is not limited to prior treatment of the plaintiff; the employer's policy and practice regarding employment of a protected class (including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating hiring criteria); and the use of subjective criteria in employment decisions. *Simms* at 1328. Based on the evidence presented, Johnson does not raise a reasonable inference of pretext.

Procedural irregularities.

Johnson contends two procedural irregularities in the way Weld County selected Bogott support an inference of pretext. *See Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1121 (10th Cir.2007) (employment decision made in contravention of company policy is procedural irregularity that may support inference of pretext); *Mohammed v. Callaway*, 698 F.2d 395, 397-398 (10th Cir.1983) (hiring of candidate without convening

36

committee or interviewing candidates contravened procedure described in job announcement and supported inference of discrimination).

First, Johnson contends the interview committee improperly removed her from consideration after one committee member, Barbara Connolly (then Eurich), rated her "do not recommend" on her Interview Score Sheet.[22]  Johnson claims the vote should not have had such preclusive effect, based on Connolly's statement that

> [i]f a panel member rates a candidate 'not recommended,' that candidate *will most likely* no longer be eligible.

Connolly Decl., Def.'s Ex. A-3, ¶ 6 (emphasis added).  As an initial matter, it is a stretch to characterize this equivocal statement as a binding hiring policy or procedure within the meaning of *Timmerman* or *Mohammed*.  Even assuming, for the sake of argument, that it did constitute binding hiring policy, Johnson ignores the equally binding statement of committee member Talmadge, which shows that, under the circumstances, Connolly's rating did preclude Ms. Johnson from further consideration.  According to Talmadge,

> If a panel member rates a candidate "not recommended," *and that candidate was not highly ranked[23] by the other panel members*, that candidate will no longer be eligible.

Talmadge Decl., Def.'s Ex. A-20, ¶ 8 (emphasis added).  It is undisputed that Johnson was ranked fourth out of five candidates, overall.  Talmadge Decl., Def.'s Ex. A-20, ¶ 13;

---

[22]     Each interview committee member had one Interview Score Sheet listing the five candidates.  Beside each candidate's name, the committee member awarded points and placed a check in one of two boxes marked "recommend" and "do not recommend."(*See* Interview Documents, Pl.'s Ex. 13, pp.5-11.)

[23]     The committee ranked the candidates by tallying the scores or points awarded.  (*See id.*; Talmadge Decl., Def.'s Ex. A-20, ¶ 9.)

Interview Docs., Pl.'s Ex. 13, p.2. Whether either or both of these statements constitutes

binding County policy for the purposes of the *Timmerman* pretext inquiry, Johnson's

evidence fails to establish any procedural irregularity and raises no inference that the

County's stated reasons for non selecting her were but a pretext for gender discrimination.

 Johnson also finds procedural irregularity in the fact that Connolly was the seventh

member of an Interview Committee that she contends was limited to six. As support for

her assertion, Johnson points to the Interview Check Sheet,[24] which has only six

numbered spaces for the names of members and six numbered columns for entering

scores and checkmarks.[25] (*See* Pl's Opp'n, Doc.19, p.27, ¶ 13; Interview Docs., Pl.'s Ex.

13, p.2.) Johnson identifies no policy or procedure limiting committee membership to

six, and offers no evidence suggesting Connolly's participation was procedurally

inappropriate or unlawful. *See Timmerman*, 483 F.3d at 1121. Even if it were, moreover,

no inference of pretext or discriminatory animus would follow.

 Where the alleged procedural irregularity does not affect members of a protected

---

[24] The Interview Check Sheet combines the information from all seven committee members' Interview Score Sheets. (Interview Documents, Pl.'s Ex. 13, p. 2.)

[25] Johnson attempts to make an issue of the fact that the facsimile image of the Interview Check Sheet does not show Connolly's "do not recommend" check-mark for her candidacy. (Opp'n, Doc.19, p.27, ¶ 13). She does not actually dispute that Connolly gave her such a mark, and it appears the facsimile copy simply cut the "do not recommend" column off the Interview Check Sheet. The Interview Score Sheet reflects the rating. (Interview Documents, Pl.'s Ex. 13, p.1, 2.)

Each interviewer's column contains a box for a score on the left, a "recommended" mark in the middle, and a "do not recommend" mark on the right. Ms. Connolly's column is the farthest to the right. Thus, the portion of her column where any "do not recommend" marks would appear is at the far right edge of the page. Her scores for each candidate and her three "recommend" checkmarks are visible, whereas the "do not recommend" marks she gave Ms. Johnson and one other candidate are not visible on the photocopied image of the page. (*See id.*)

class in isolation from other candidates, the irregularity itself suggests neither that the defendant's proffered reason for its decision was pretextual, nor that the defendant was motivated by illegal discrimination. *Voltz v. Coca-Cola Enterprises, Inc.*, 91 Fed.Appx 63, 70 (10th Cir.2004) (quoting *Kendrick v. Penske Transp. Serv., Inc.*, 220 F.3d 1220, 1230 (10th Cir.2000)). Here, although Connolly was the only member to mark Ms. Johnson "not recommended," neither her scores nor that vote determined the candidates' rankings. Eliminating Connolly's scores from the final tally would not have affected Johnson's ranking as fourth out of five candidates, with Bogott ranked second. (*See* Interview Docs., Pl.'s Ex. 13, p.2.) As only the top two candidates are officially recommended for hire by the committee at the bottom of the page, there is nothing linking any procedural irregularity in Connolly's participation with any inference of discriminatory animus.

As Johnson concedes, Weld County's published hiring procedure is silent on the effect of a "not recommended" vote by one Interviewing Committee member as well as on the requisite or maximum membership of the committee.[26] (See Opp'n, Doc.19, p. 26-27, ¶ 12.) Neither Connolly's vote nor her participation amounts to an irregularity under those circumstances, and Johnson's attempt to establish pretext under *Timmerman* is unavailing. *See Simms*, 165 F.3d at 1329 (holding that allegations of procedural irregularities in promotion selection did not support inference of pretext because the

---

[26] The policy states, in pertinent part: "The Executive Director of the Weld County Division of Human Services receives the recommendations of the Interviewing Committee and hires individuals based on those recommendations and the reference checks." (Job Descriptions, Pl.'s Ex. 12, p.5; Interview Docs., Pl.'s Ex. 13, p.3.)

challenged procedures were not inconsistent with defendant's published policies).

Reliance on subjective criteria.

Johnson contends that Weld County relied on subjective criteria in its decision not to hire her supporting an inference that their qualifications-based explanation for not hiring her was a pretext for discrimination. Johnson points to evidence that Connolly marked Johnson "not recommended" because she believed Johnson "lacked tact." *See* Connolly Decl., Def.'s Ex. A-3, ¶ 9 (Connolly states she voted "do not recommend . . . . because I did not believe Ms. Johnson possessed the accounting skills, tact, or ability to solve problems required of the Fiscal Officer in the Department of Human Services").

Although courts generally view subjective evaluation methods with skepticism, subjective considerations are not unlawful per se. Typically, they raise an inference of pretext only when the criteria on which employers ultimately rely are entirely subjective in nature. *Webb v. Level 3 Communications, LLC*, 167 Fed.Appx. 725, 731 (10th Cir.2006) (internal quotations omitted) (affirming summary judgment for employer where evidence indicated the employer considered both objective and subjective criteria in its employment decision); *see also Mohammed*, 698 F.2d at 401 (the use of subjective factors supports an inference of pretext when an employer justifies its rejection of a protected-class candidate on the basis of such factors even though the candidate is objectively better qualified than the non-minority chosen).

The role of the courts in discrimination cases is "to prevent unlawful hiring practices, not to act as a super personnel department that second guesses employers'

business judgments." *Simms*, 165 F.3d at 1330. Here, it is undisputed that the committee relied on an objective ranking system in deciding whom to recommend for hire. As noted, Connolly's participation and vote did not unilaterally affect the candidates' rankings or the ultimate recommendations and it cannot reasonably be argued that the County relied at all – and certainly not "entirely" – on her subjective "do not recommend" vote. Under the applicable law, Johnson's subjective criteria argument fails to raise an inference of pretext in her nonselection for the Fiscal Officer position.

Alternatively, Johnson's evidence fails to establish that she was objectively better qualified for the position than Bogott. The Position Information Sheet for the Fiscal Officer position states that a Bachelor's Degree in Business Administration with an emphasis in Accounting was required, and supervisory experience would be helpful. (*See* Interview Docs., Pl.'s Ex. 13, p. 2, 3.) When Weld County held interviews on March 7, 2005, Bogott possessed a B.S. with a double major in Finance and Accounting, a Supervisor Certificate, and over thirty-five years' experience in finance and accounting Viewing the evidence most favorably to Johnson, she held a bachelor's degree with a minor in accounting, an associate's degree in accounting and several undergraduate accounting courses. Johnson nevertheless contends Bogott was objectively less qualified because he proved unable to perform his job.[27] It is true that evidence an employer misjudged candidates' qualifications may be probative of the question of pretext. *See*

---

[27] Her belief is based on observations that Bogott required training from her, that he constantly asked for help, and that the Head Start program was in a huge deficit. (*See* Johnson Dep., Pl.'s Ex. 2, 11:21-14:17.)

*Burdine*, 450 U.S. at 259.  In applying this principle, however, the court examines only the facts as they appeared to the decision-maker.  *Rivera v. City and County of Denver*, 365 F.3d 912, 925 (10th Cir.2004).  Courts do not sit as super-personnel departments second-guessing employers' business judgments with the benefit of twenty-twenty hindsight.  *Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 813-14 (10th Cir.2000); *see also Tran v. Trustees of State Colleges in Colo.*, 355 F.3d 1263, 1268-69 (10th Cir.2004) (holding that employer's good faith judgment does not become pretextual merely because it turns out to be erroneous).  Even if Johnson is correct and Bogott proved less able than she at the Fiscal Officer job, that fact would not support an inference that her comparative qualifications were objectively greater at the time of the hiring decision, or that Weld County's proffered reasons for hiring Bogott are unworthy of credence.

<u>Other evidence of pretext</u>.

Johnson attempts to raise an inference of pretext because Weld County's rejection of her for the position conflicts with other assessments of her performance.  (*See* Opp'n p. 25, ¶ 9.)  Leaving aside the fact that Weld County's proffered explanation for failing to hire her had nothing to do with any poor performance or performance reviews, evidence her nonselection "conflicted" with her history of favorable reviews fails to raise an inference of pretext.

Johnson relies on cases in which the allegedly discriminatory employment decision was to terminate or not renew an employee's contract.  *See Garrett v. Hewlett-Packard*

*Co.*, 305 F.3d 1210, 1218 (10th Cir.2002) (reversing summary judgment for employer where fact question existed whether employee's performance was true basis for poor evaluations and termination); *Cole v. Ruidoso Mun. Schools*, 43 F.3d 1373, 1380 (10th Cir.1994) (reversing summary judgment for employer where conflicting evaluations raised fact question about true reasons for refusing to renew employee's contract). Here, the employment decision was the County's selection of someone other than Johnson for a promotion based not on an assertion that she was unqualified for the position, but on the assertion that the person selected was more qualified than she. Under these circumstances, positive performance evaluations she received while serving as an accountant for the County do not contradict the proffered reason for the hiring decision, and do not raise an inference of pretext or invidious discrimination. The published job duties for the two positions reveal that the positions are qualitatively different, and that the latter supervises the former, and so do not lend themselves to objective, side-by-side comparison. (*See* Job Descriptions, Pl.'s Ex. 12, p.3-6.)

Johnson also contends Speckman's positive feedback of her performance while interim Fiscal Officer constitutes a relevant conflicting evaluation for pretext purposes. (See Opp'n, Doc.19, p.25, ¶ 9.) I note Speckman's memo stating Johnson's performance in that capacity was "good" is dated August 30, 2005, more than five months after the interview process for the Fiscal Officer position. (*See* Interim Position Docs., Pl.'s Ex. 7, p. 2.) The authority concerned with conflicting evaluations involve adverse actions that follow, not precede, those evaluations, and Speckman's evaluation is not probative of any

43

pretext in the hiring decision at issue.  *See also Rivera*, 365 F.3d at 925.

Mutually inconsistent explanations.

Finally, Johnson argues mutually inconsistent explanations for Weld County's hiring decision support an inference of pretext sufficient to withstand summary judgment. The alleged inconsistency is between the County's proffered stated reason that she was not hired because she was not as qualified as other candidates for the job and Speckman's comments to Burns and Willoughby that Johnson was not hired because of her gender and her multiple sclerosis.  (See Opp'n, Doc.19, p.26-27, ¶ 12.)  Even if her testimony about Speckman's statements were admissible (and I have already determined it is not), Johnson's reliance on it would be unavailing on the issue of pretext.

Johnson relies on the unreported case of *Hare v. Denver Merchandise Mart, Inc.*, 255 Fed.Appx. 298, 305 (10th Cir.2007), in which the district court's order granting summary judgment for an employer was reversed because an inference of pretext was raised where individuals involved in decision to terminate plaintiff testified alternately that the decision was, and was not, based on plaintiff's performance.  In *Hare*, the inconsistent explanations were both offered as legitimate, non-discriminatory reasons for the employment decision.  Here, Weld County obviously would not proffer Speckman's alleged comments as a legitimate explanation and the case is inapplicable.  Speckman's comments, if admissible, would constitute direct evidence of discriminatory animus in this case.  Their status as circumstantial evidence supporting an inference of pretext would, under any such scenario, be entirely superfluous.

# IV. CONCLUSION.

The *McDonnell Douglas* burden-shifting analysis applies to Johnson's federal and state employment discrimination claims, as the direct evidence of discriminatory intent she proffers is inadmissible hearsay, and she presents no direct evidence of retaliation. Based on evidence in the record, Johnson establishes no prima facie case of retaliation, no prima facie case of constructive discharge, and no prima facie case that she is disabled within the meaning of the ADA. While the fact she was a qualified woman applying for the Fiscal Officer position and was not hired is sufficient to establish a prima facie case of sex-based discrimination, Johnson's evidence is insufficient to cast doubt on Weld County's proffered explanation that Johnson was the fourth-ranked of five candidates and that the man ultimately selected for the position was better qualified than she.

The County's Motion for Summary Judgment is GRANTED. Judgment shall enter in favor of Defendant and against Plaintiff on each of Plaintiff's claims against it. The parties shall bear their own fees and costs.


Dated September 24, 2008.          **s/John L. Kane**
                                   SENIOR U.S. DISTRICT JUDGE